**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:17-CR-100-CRS**

**UNITED STATES OF AMERICA,**
                                         **Plaintiff,**

**v.**

**TREYVON MILES, et al.,**                        **Defendants.**

### Report and Recommendation

Defendants Treyvon Miles, Chillvon Randolph, and Marcus Knight have filed motions to suppress evidence obtained during a traffic stop that occurred on November 27, 2016. (DN 25; DN 33.) This matter was referred to the undersigned for a report and recommendation on October 11, 2017. (DN 36.) The Court held hearings on November 6, 2017 and December 14, 2017, whereupon evidence was presented and witnesses were heard. For the reasons stated below, the undersigned **RECOMMENDS** that defendants' motions to suppress be **DENIED**.

### I. Statement of Facts

#### A. Detective Ryan Whitford

Ryan Whitford, a detective with the Ninth Mobile Division[1] ("Ninth Mobile") of the Louisville Metro Police Department ("LMPD"), testified that while on patrol on November 27, 2016, he observed a silver Cadillac "disregard a stop sign." (DN 39, #103.) Prior to witnessing the silver Cadillac disregard the stop sign, other Ninth Mobile officers had told him via radio that they had seen a "fast-moving vehicle" run stop signs, and that the vehicle was headed in his

---

[1] Detective Whitford explained that the Ninth Mobile Division is part of the patrol bureau of the LMPD; its primary purpose is to patrol areas of Louisville with high rates of violent crime and gun crime.

direction. (*Id*.) With the help of other Ninth Mobile officers, Detective Whitford and his partner stopped the silver Cadillac, and based on their "normal practice," ordered the occupants out of the vehicle. (*Id*. at 106.) Detective Whitford stated that during traffic stops, he usually orders the occupants out of the vehicle because of the heightened risk of violence that often accompanies his patrols. (*Id*.) After extracting the four occupants from their vehicle – three of whom turned out to be defendants Knight, Randolph, and Miles – Detective Whitford and the other officers on the scene patted them down for weapons and found none. (*Id*. at 108.) Detective Whitford was denied consent after asking to search the vehicle, but because the Ninth Mobile's K9 unit was "on hand," he had the police dog "[run] around the vehicle." (*Id*.) While the police K9 was sniffing around the vehicle's exterior, he "indicated with great excitement" on the driver's side door, and did so again on the glove compartment. (*Id*. at 108–09.) Upon investigating the glove compartment, Detective Whitford noticed that it had been "disabled," and he could not open it by using the handle. (*Id*. at 109.) He eventually figured out how to open it by using a screwdriver he found beneath the glove compartment, and when he opened it, he found four handguns. (*Id*.)

### B. Detective Brian Wilson

Brian Wilson, another detective with Ninth Mobile, testified that on November 27, 2016, he observed a vehicle traveling at a high rate of speed "blow through the intersection" that he and his partner were stopped at. (DN 42, #196.) Having to "accelerate pretty heavily" to keep up with the vehicle, Detective Wilson followed the speeding car and watched as it "disregarded [a] stop sign." (*Id*.) He stated that after following the car for a short time and seeing it fail to stop at multiple stop signs, he had to "accelerat[e] pretty much as hard as [the] car [would] go" to

keep up with the speeding vehicle. (*Id*. at 197.) Detective Wilson watched as the car pulled into a nearly-empty gas station parking lot but parked far away from the entrance, a decision he found strange. (*Id*.) As he drove past the gas station and parked a short distance away, Detective Wilson saw three people huddled around the front passenger's door; he also saw someone seated in the front passenger's side. (*Id*.)

Detective Wilson stated that while he had been following the car, he had been relating information about the car's movements to other nearby Ninth Mobile officers. (DN 42, #198–99.) With the help of other officers, including Detective Whitford, Detective Wilson and his partner pulled the vehicle over, but not before seeing it disregard at least one more stop sign. (*Id*. at 200–01.) He had previously noticed that the car's license plate was not properly illuminated, which had make it difficult for him to read it and check to see if there were any issues with the car. (*Id*. at 204.) Approximately thirty seconds after stopping the vehicle, the K9 unit assigned to Ninth Mobile arrived on the scene. (*Id*. at 206.) After the police K9 made an indication while walking around the vehicle and again on the locked glove compartment, Detective Whitford successfully opened the locked container. (*Id*. at 207.) Inside, Detective Wilson saw four handguns, one of which turned out to have been stolen from Indiana. (*Id*. 208.)

### C. Detective Todd Benzing

Todd Benzing, a detective and dog handler with the Ninth Mobile, also testified at the hearing. (DN 42, #253.) His K9 partner, a Belgian Malinois named Maverick, is a narcotics dog trained to find marijuana, methamphetamine, cocaine, heroin, and other opiate derivatives. (*Id*. at 254–55.) Detective Benzing stated that once Maverick detects one of odors he is trained to find, he "shows a change in behavior," which usually manifests as the K9 sitting down and

staring at where the odor is emanating from. (*Id*. at 255–56.) Maverick is certified every year by the Kentucky Law Enforcement Council ("KLEC"), and to be certified to search vehicles, he must pass a test wherein he must locate narcotics located in six vehicles while not giving a false positive on any of the four empty vehicles. (*Id*. at 256.) If Maverick alerts on any one of the vehicles without narcotics, he automatically fails the test. (*Id*. at 277.) Aside from their regular four hours of training per week with the K9 unit, Detective Benzing and Maverick informally train in the office, where other detectives place scented hides around the office, and Maverick attempts to find them. (*Id*. at 257.) Detective Benzing stated that "from time to time," Maverick indicates an odor but the officers do not find any narcotics. (*Id*. at 258.) He explained that the reason for a false indication is because that the residual odor for some drugs, such as marijuana, are strong and often linger in certain objects, such as paper currency and guns. (*Id*.) Regarding guns in particular, Detective Benzing stated that the textured grips found on most guns retain narcotics odors. (*Id*. at 259.)

On November 27, 2016, Detective Benzing and Maverick were working with the Ninth Mobile when they assisted in a traffic stop. (DN 42, #265.) As members of the Ninth Mobile, Detective Benzing and Maverick usually shadow the other detectives as they patrol an area, acting as an "auxiliary car or backup car." (*Id*. at 257.) After arriving on the scene of the traffic stop, Detective Benzing deployed Maverick to sniff around the car, and the K9 "indicated almost immediately on the [driver's front] door." (*Id*. at 265.) He found this behavior to be unusual because he typically would have to "run [Maverick] around a car at least once" before the police dog would indicate, if he did at all. (*Id*. at 267–68.) Believing that he had established probable cause to search the rest of the vehicle, Detective Benzing opened the door, where after Maverick

"went straight to the glove box" and "gave [him] a second indication." (*Id*. at 265–66.) After defendants were detained and the guns found in the glove compartment laid out on the car's trunk, Maverick once again indicated on them. (*Id*. at 271.)

## II. Summary of Law

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures. U.S. CONST. AMEND. IV. The Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). The government implies that one of the few exceptions – the automobile exception – is applicable in this case. (DN 47, #325.) The automobile exception allows law enforcement officers to lawfully search a vehicle without a search warrant if the vehicle is readily mobile and the officers have probable cause to believe that it contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Probable cause has been defined in this circuit as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that evidence of a crime will be located on the premises of the proposed search." *U.S. v. Jackson*, 470 F. 3d 299, 306 (6th Cir. 2006).

## III. Analysis

Because the government has relied on the automobile exception to the Fourth Amendment's warrant requirement, for the undersigned to find that the search was constitutional, the government must demonstrate that (1) the officers conducted a lawful traffic stop supported by reasonable suspicion, and (2) they had probable cause to believe that defendants' vehicle

5

contained contraband. *U.S. v. Ross*, 456 U.S. 798, 823 (1982). Defendants have made numerous arguments that attempt to undermine the government's justification of probable cause; the Court will address these arguments in the appropriate section.

### A. Lawful Traffic Stop

The Court first turns to the issue of whether the police lawfully stopped defendants' vehicle. The government argues that the police did, because they reasonably suspected that defendants committed a traffic infraction when they observed defendants running stop signs, speeding, and operating a motor vehicle without a properly illuminated license plate. (DN 47, #325–326.) Defendants do not appear to contest the lawfulness of the traffic stop, instead reserving their contentions to complaints of pretextuality. (DN 46, #312.)

To lawfully stop a vehicle, a police officer must possess either (1) probable cause that a civil infraction has been committed or (2) a reasonable suspicion that criminal activity is afoot. *U.S. v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n. 6 (6th Cir.2004)). "Reasonable suspicion" to support an investigatory stop is more than "ill-defined hunch," but rather must be supported by a particularized and objective basis for suspecting the particular person(s) of criminal activity. *U.S. v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016). The officer's reasonable suspicion must be considered "under the totality of the circumstances, considering all of the information available to law enforcement officials at the time." *Lyons*, 687 F. 3d at 763 (citing *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir.2007)). Certain factors, such as a suspect's apparent nervousness or presence in a high crime area, while not sufficient in of themselves to establish reasonable suspicion, are relevant in the totality of the circumstances analysis. *U.S. v. Pacheco*, 841 F.3d 384, 393–94 (6th Cir. 2016).

The undersigned finds that the officers' traffic stop was supported by probable cause and therefore lawful. As a general matter, police officers have the authority to stop and, for Fourth Amendment purposes, "seize" a vehicle when they have probable cause to believe that a traffic offense has occurred. *Delaware v. Prouse*, 440 U.S. 648, 659 (1979). It is uncontested that multiple officers of the Ninth Mobile saw defendants drive through numerous stop signs without first coming to a complete stop. (DN 39, #103; DN 42, #197.) Additionally, Detective Wilson observed that prior to stopping defendants, the license plate on their car was unreadable because it was not properly illuminated, a violation of Kentucky law. KY. REV. STAT. ANN. §186.170(1); (DN 42, #204.) And although no explanation is likely needed, not obeying stop signs is also a violation of Kentucky law. KY. REV. STAT. §189.330. Either of defendants' traffic infractions could have served as the basis for a lawful traffic stop, let alone both.

Defendants suggest that the officers' traffic stop was merely pretextual, and that the real reason for pulling them over was not to enforce the rules of the road, but to search their vehicle for drugs and guns. Even if this was true – and defendants have not proffered anything more than their suspicions to suggest that it is – it is immaterial, because the Supreme Court has held that an officer's subjective intentions for stopping a vehicle are not relevant so long as he has probable cause to believe that a traffic offense has been committed. *Whren v. U.S.*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). In *Whren*, for instance, vice-squad officers on the hunt for illegal narcotics observed the defendants fail to use their turn signal while operating their vehicle at speeds exceeding the legal imit. *Id.* at 808–09. Their stop of the defendants' vehicle was constitutional because despite stopping it with the intent of searching for drugs, the defendants

7

were still breaking municipal traffic codes by not obeying stop signs. *Id*. *See also U.S. v. Wickersham*, 344 Fed. App'x. 155 (6th Cir. 2009) (traffic stop and subsequent arrest did not violate Fourth Amendment when police were actively looking for a reason to stop the defendant and search for drugs; defendant obliged by changing lanes without activating his turn signal).

Because the undersigned has found that the officers' stop of defendants' vehicle was supported by probable clause, it is unnecessary for the undersigned to analyze whether the police had reasonable suspicion to believe that defendants were involved in criminal activity prior to stopping defendants' vehicle.

### B. Probable Cause to Search Defendants' Vehicle

Having determined that the officers' traffic stop was supported by probable cause, the undersigned now turns to whether the police had probable cause to search defendants' vehicle. The government argues that Maverick's positive indication that he smelled narcotics inside the vehicle granted the officers probable cause to conduct a thorough search of the vehicle's interior. (DN 47, #326–27.) Defendants lodge a host of arguments against the validity of Maverick's positive indication. First, they argue that the dog sniff violated the Supreme Court's holding in *Rodriguez v. U.S.* because it unreasonably prolonged the traffic stop. (DN 46, #313.) Second, they argue that while the police did not "search" the vehicle by having Maverick sniff around its exterior, they conducted a search when Maverick stuck about half his snout through the open driver's side window and into the vehicle. (*Id*. at 317.) Finally, they argue that Maverick's sniff was not reliable and therefore could not establish probable cause because they claim the K9 has been trained to alert to non-narcotics. (*Id*. at 319–20.)

As an initial matter, it is well-settled law that "a positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Torres–Ramos*, 536 F.3d 542, 554 (6th Cir. 2008). *See also Illinois v. Caballes*, 543 U.S. 405 (2005) (holding that the use of a "well-trained narcotics-detection dog" to sniff around the exterior of a vehicle during a traffic stop does not implicate Fourth Amendment privacy interests). Defendants do not appear to argue that this is not an accurate statement of the law. Absent more, it is clear that the police had probable cause to search the glove compartment in defendants' vehicle. Therefore, the undersigned will examine the circumstances surrounding the dog sniff and determine if there were any procedural defects that would invalidate it.

1. *Rodriguez v. U.S.*

Defendants' first attempt to undermine the validity of Maverick's sniff is by arguing that the dog sniff unreasonably extended the length of the traffic stop, thereby violating the Supreme Court's rule in *Rodriguez v. U.S.* (DN 46, #313.) In *Rodriguez*, the Supreme Court held that a traffic stop that exceeds the time needed to handle the matter for which the stop was made is a violation of the Fourth Amendment. 135 S. Ct. 1609, 1612 (2015). Moreover, an officer's authority for seizure ends when the tasks tied to the traffic infraction are (or should have been) completed – unless the officer has a reasonable suspicion that the vehicle's occupants are involved in criminal activity. *Id*. at 1614. Defendants argue that there has been a similar unreasonable extension in this case because the officers "pursu[ed] [an] interest beyond the mission of the stop [by checking if any defendants had warrants]." (DN 46, #314.) They assert that "any delay caused by these tactics [running warrant checks on the car's occupants] is too much [of a delay] under *Rodriguez*." (*Id*. at 317.)

As an initial matter, defendants are mistaken about the interplay of warrant checks and traffic stops. Defendants have asserted that the police checking passengers' licenses and running warrant checks on them "is not part of the mission of a traffic stop." (DN 46, #315.) Yet the Sixth Circuit has held just the opposite. *See U.S. v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (holding that it was not an unnecessary extension of the traffic stop for the officer to get identification from both the driver and passenger, and then check to see if either had any outstanding warrants after stopping them for speeding). Although *Smith* was decided five years before *Rodriquez*, the *Smith* Court relied on earlier Sixth Circuit precedent identical to the Supreme Court's holding in *Rodriquez*. *Id*. (citing *U.S. v. Bell*, 555 F.3d 535 (6th Cir. 2009); *U.S. v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)).

But even if the undersigned was to ignore clear and unambiguous Sixth Circuit precedent at defendants' behest, their argument is still meritless because it is premised on a faulty understanding of *Rodriguez*. Defendants seem to believe that *Rodriguez* prohibits officers from doing anything that "diverts from the mission of the traffic stop," and that any of these "diversions" constitute the unreasonable extension of a traffic stop that *Rodriguez* bars. (DN 46, #317.) But this is simply incorrect. *Rodriguez* does not *per se* prohibit officers from performing functions unrelated to a routine traffic stop while the stop is ongoing. Instead, *Rodriguez* prohibits officers from performing those functions when they temporally extend the traffic stop beyond the time needed to complete it (or, alternatively, after the traffic stop is completed). *Rodriguez*, 135 S. Ct. at 1614–15. So even if checking for warrants on the passengers of the vehicle was outside the scope of a normal traffic stop, checking the license and registration of the driver was not, nor was conducting a cursory interview of the occupants of the vehicle. *U.S. v.*

*Smith*, 601 F.3d 530, 542 (6th Cir. 2010). Based on the undersigned's review of the police bodycam footage, both of these activities were ongoing when Maverick alerted outside the vehicle. Moreover, defendants have not attempted to argue that the traffic stop would have concluded and they would have been free to leave before Maverick began sniffing around the exterior of their vehicle.

Defendants' mischaracterization the facts of *Rodriguez* helps to illustrate this concept. In *Rodriguez*, the dog sniff occurred roughly eight minutes after the police officer issued a written citation to Rodriguez. *Rodriguez*, 135 S. Ct. at 1613. Rodriguez should have been free to leave after he was given his written warning, but he was forced to stay so that the police could conduct a dog sniff around his vehicle. Here, on the other hand, Detective Benzing led Maverick around the vehicle while other Ninth Mobile officers checked for outstanding warrants and interviewed defendants and within the time it would have taken to issue defendants traffic citations. Adopting defendants' representations of what *Rodriguez* stands for would require the undersigned to rewrite clear Supreme Court precedent.

Therefore, the undersigned finds that the officers did not unreasonably extend the length of the traffic stop.

### 2. Maverick's Intrusion into the Vehicle

Next, Defendants argue that while the dog sniff around the perimeter of the vehicle was not a search, defendants' Fourth Amendment rights were violated when Maverick twice stuck his snout into an open window on the driver's side before making a positive indication. (DN 46, #317–18.) Defendants argue that the driver's side window was only open because the police stopped them, and they were never given an opportunity to close it before Maverick was deployed. (*Id*. at 319.) In support of their argument, they cite *U.S. v. Sharp*, where the Sixth

Circuit stated that for a K9 sniff to be constitutional, "the canine team must lawfully be present at the location where the sniff occurs." 689 F.3d 616, 618 (6th Cir. 2012).

In their first brief, defendants curiously omit *Sharp*'s key holding, and it is only after the government brings the holding to the Court's attention that defendants decide to address it. This timing is frankly troubling, as the key holding in *Sharp* is unkind to defendant's argument. The Sixth Circuit held in *Sharp* that when a police dog "instinctively" jumps inside of a car and makes a positive indication, it is not a Fourth Amendment violation unless the police encouraged or facilitated the dog's jump. *Sharp*, 689 F.3d 616, 620 (6th Cir. 2012). In doing so, the Sixth Circuit joined a number of other circuits that had already come to the same conclusion. *Id*. at 619 (citing *U.S. v. Pierce*, 622 F.3d 209, 213–14 (3d Cir. 2010); *U.S. v. Lyons*, 486 F.2d 367, 373 (8th Cir. 2007); *U.S. v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989)). There are two elements that must be present before an "exterior" canine sniff can be invalidated based on this doctrine. First, the police must have opened the point of entry that the dog uses to enter the car or have ordered one of the car's occupants to do so. *U.S. v. Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009). But police officers do not have an affirmative duty to close an open door or window that an occupant of the car has opened of his own volition. *U.S. v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012) (citing *U.S. v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007)). Second, the dog's entry into the car must have been orchestrated by the police rather than the dog's instinctual reaction to the scent of contraband. *Id*. *See also Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 880 (10th Cir. 2014) (reaffirming the two-step *Vasquez* test). In their response, defendants intimate that both elements are met because the "driver's window was open *because of* the traffic stop." (DN

48, #334) (emphasis in original). They also allege that the "handler allowed the dog to jump up and put his nose in the window," which speaks towards the second element of the test. (*Id.*)

Based on a review of the police bodycam footage and hearing testimony, the undersigned cannot conclude that the officers ordered defendants to roll down the driver's side window. In Detective Whitford's bodycam footage, he can be seen approaching defendants' vehicle, and before he arrives at the driver's window, one of the defendants is already rolling the window down. There is no indication from Detective Whitford's footage that any officer on the driver's side of the vehicle ordered any defendant to roll down the driver's window, whether verbally or with a gesture. In other bodycam footage from Detective Wamsley, Detective Hughes-Miller is seen knocking on the front passenger window and indicating to roll it down, an order the front passenger immediately complies with. At the hearing, Detective Wilson noted that he was not at the driver's window when it was rolled down, and he was unsure whether one of the defendants rolled it down on his own accord or at the orders of another officer. (DN 42, #214.)

But even if there was definitive evidence showing that the officers opened the driver's window, there is no evidence whatsoever that they orchestrated or encouraged Maverick's brief and partial entry into the vehicle. Defendants repeatedly assert that Detective Benzing "allowed" Maverick to enter the vehicle twice, but they cite to no part in the record that would even suggest that Detective Benzing (1) knew that Maverick was about to jump up to put his snout in the window and (2) allowed it to happen anyway. (DN 48, #334.) On the contrary, nothing from Detective Benzing's testimony at the suppression hearing would indicate that this was the case. Detective Benzing testified that when Maverick jumped up and stuck half of his snout through the open window, he was doing so because "[h]e's trying to get to the odor. He wants to get

13

paid."[2] He further explained that Maverick will "go up high" when there's an open window in an attempt to get to the odor. (DN 48, #269.) Even though the detective's statement implies that Maverick has a history of poking his nose into open windows, according to his testimony, Maverick does so because he is trying to "get to the odor," not because he was specifically trained by the police to enter open windows. (*Id.*) This is identical to the police dog's conduct in *Sharp*, where the K9 was known to have jumped into open vehicle windows prior to the traffic stop at issue in that case. *U.S. v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012). The pertinent question, as the Sixth Circuit stated, is not whether the K9 has a history of jumping into cars, but whether he does so because he is specifically trained to do so or because he is trying to get close to the smell of narcotics. *Id.* In this case, as it was in *Sharp*, it is clearly the latter. Defendants' repeated assertion that Detective Benzing "allowed" Maverick to stick his snout into their vehicle does nothing to change that.

Therefore, the undersigned concludes that the police K9's entry into defendants' vehicle was not a violation of their Fourth Amendment rights.

### 3. Maverick's Reliability

Defendants' last argument attacks the reliability of Maverick's drug-sniffing capabilities. They argue that because Maverick has previously made positive indications on guns, without finding drugs, and was rewarded for it (thereby reinforcing the behavior), the police should not have relied on his indication on defendants' vehicle's glove compartment. (DN 46, #320.) At the suppression hearing, Detective Benzing testified that he and Maverick have "probably" taken forty-five guns off the street in the last two years, and "probably at least a dozen of those" were

---

[2] Detective Benzing explained that Maverick "gets paid" with his favorite tennis ball when he accurately detects narcotics. If Maverick makes a positive indication but the officers only finds residue, then Maverick does not "get paid."

14

discovered when Maverick made an indication on an area, but the police did not find any narcotics. (DN 42, #290.) Defendants point to the fact that these statistics mean that at least 25% of the time of when Maverick finds a gun, he must have smelled something other than narcotics because no narcotics were found. (DN 46, #320.) Therefore, they allege, it was improper for the police to believe there were narcotics inside the vehicle. (*Id*.)

As the undersigned stated in a previous section, it is well-established that a "positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *U.S. v. Robinson*, 390 F.3d 853, 874 (6th Cir. 2004) (citing *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994)). But to support a finding of probable cause, the government must establish the "training and reliability of the dog." *Id*. (citing *Diaz*, 25 F.3d at 394). In a recent case, *Florida v. Harris*, the United States Supreme Court discussed how the government can demonstrate that a drug-sniffing dog's ability to detect narcotics is reliable enough to establish probable cause. There, the Supreme Court rejected the Florida Supreme Court's requirement that the government meet every element of its "strict evidentiary checklist" before the government could rely on a narcotics dog's affirmative indication as sufficient evidence of probable cause. *Florida v. Harris*, 568 U.S. 237, 244–45 (2013). Of particular concern to the Supreme Court was the Florida Supreme Court's absolute requirement that the government present evidence of a narcotics dog's performance in the field, including data on his prior "hits" and "misses." *Id*. at 245. Not only did Supreme Court hold that the absolute requirement violate the longstanding "totality of the circumstances" analysis the Supreme Court had established for determining probable cause, but it explained why relying on field data as

opposed to controlled testing was fundamentally flawed. *Id*. at 245–46. Writing for a unanimous Court, Justice Kagan explained:

> The Florida Supreme Court treated a dog's response to residual odor as an error, referring to the "inability to distinguish between [such] odors and actual drugs" as a "facto[r] that call[s] into question Aldo's reliability." But that statement reflects a misunderstanding. A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime (like the precursor chemicals in Harris's truck) will be found.
>
> . . .
>
> Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.
>
> For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. **If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search**.

*Id*. at 246–47 (internal citations omitted) (emphasis added).

Defendants ask the undersigned to do the same – to ignore Maverick's rigorous training and success in controlled tests and find him to be unreliable because he has been rewarded for indicating in situations where only drug residue is found. (DN 46, #320–21.) Defendants have not introduced any evidence that would undermine the veracity of Maverick's training or certifications from KLEC. Instead, the available evidence indicates that Maverick has been recertified every year by KLEC – where even one false positive results in automatic failure – and

he regularly trains for upwards of four hours every week. (DN 42, #256–57.) From the evidence adduced at the suppression hearing, it is the undersigned's understanding that KLEC's tests are similar to those that the Supreme Court expressed its approval of in *Harris*. Defendants' assertion that "the dog is being trained to alert without the presence of drugs" – and is thus not reliable – (1) ignores the fact that Maverick still indicates when he smells the scent of narcotics, which, as the Supreme Court stated in *Harris*, is a sufficient basis to establish probable cause; and (2) implies that Maverick has been trained to know, *a priori*, when a narcotics scent will lead to contraband and when it will not.

Therefore, the undersigned finds that Maverick's indication is a reliable indicator that illicit narcotics are present.

### IV. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** that defendants' motion to suppress be **DENIED**.

cc: Counsel of record

## **Notice**

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Crim. P. 59(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. Id.; United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981); see also Thomas v. Arn, 474 U.S. 140 (1985).